AO 106 (Rev. 04/10) Application for a Search Warrant (USAO CDCA Rev. 11/2012)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>13581 Fox Point Road, Victorville, California | )<br>)<br>)  Case No.  5:18-MJ-00488<br>)<br>)<br>) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> See Attachment A-1

located in the     **CENTRAL**     District of     **CALIFORNIA**     , there is now concealed *(identify the person or describe the property to be seized)*:

> See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section*(s) | *Offense Description* |
|---|---|
| Title 18, USC, Sections 401(3), 402, and 152(3) | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Colin L. Schmitt, Special Agent (FBI)
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____12/13/2018_____

_____
*Judge's signature*

City and state:   Riverside, California

Hon. Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: JERRY C. YANG 276-6221:re

## AFFIDAVIT

I, Colin L. Schmitt, being duly sworn, declare and state as
follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI"), and have been so employed since April of
1997. I am currently assigned to the White Collar Crime Squad,
Riverside Resident Agency of the Los Angeles Field Office, where
I investigate crimes involving Frauds and Swindles to include
Bankruptcy Fraud. I have a Bachelor of Science in Accounting and
a Bachelor of Science in Business Administration from the
University of Missouri-Columbia. I have a Master of Business
Administration from Northeastern University. I am a Certified
Fraud Examiner as designated by the Association of Certified
Fraud Examiners. I have received training and gained experience
in interviewing and interrogation techniques, arrest procedures,
search warrant applications, the execution of searches and
seizures, computer crimes, computer evidence identification,
computer evidence seizure and processing, and various other
criminal laws and procedures. I have personally participated in
the execution of search warrants involving the search and
seizure of computer equipment, documents and other indicia of
criminal activity. As an FBI SA and Supervisory SA, I have
participated in and supervised various investigations and

prosecutions pertaining to and including violations of Title 18, United States Code, Section 401 (CONTEMPT), Title 18, United States Code, Section 402 (CONTEMPT CONSTITUTING CRIMES), Title 18, United States Code, Section 152 (BANKRUPTCY FRAUD). Through my training and experience, I have become familiar with the methods of operation of the bankruptcy system and methods to defraud. I have also attended various general fraud, and white collar investigative trainings sponsored by the FBI and other organizations. I have participated in and supervised investigative activities, arrest and search warrants, interviews, consensual monitoring, trial preparation, and subpoena preparation. As a result of my training and experience, I am familiar with federal laws relating to contempt, contempt constituting crimes and bankruptcy fraud, as well as, investigative techniques and fraud schemes employed in Southern California.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, documents and records that were collected and reviewed in the course of this investigation, information that was obtained from interviewed witnesses, and information gathered by other sworn Law Enforcement Agents/Officers. This affidavit is intended to show sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or

investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of an application for warrants to search the residence of RICHARD ALLEN MEASE ("MEASE"), located at 13581 Fox Point Road, Victorville, California (the "SUBJECT PREMISES"), the vehicle of MEASE, a white, 2006 Hummer H3, Sport Utility Vehicle, California Vehicle Registration, 5TPY313 (the "SUBJECT VEHICLE"), the business of MEASE, located at 14196 Amargosa Road, Suite I, Victorville, California (the "SUBJECT BUSINESS"), and the person of MEASE, to seize evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 401(3) (CONTEMPT), 402 (CONTEMPT CONSTITUTING CRIMES), and 152(3) (BANKRUPTCY FRAUD-FALSE DECLARATION) (collectively, the "Subject Offenses").

4.    The SUBJECT PREMISES is more specifically described in Attachment A-1 to the search warrant application. The list of items to be seized is set forth in Attachment B to the search warrant application.

5.    The SUBJECT VEHICLE is more specifically described in Attachment A-2 to the search warrant application. The list of

items to be seized is set forth in Attachment B to the search warrant application.

6.   The SUBJECT BUSINESS is more specifically described in Attachment A-3 to the search warrant application. The list of items to be seized is set forth in Attachment B to the search warrant application.

7.   MEASE is more specifically described in Attachment A-4 to the search warrant application. The list of items to be seized is set forth in Attachment B to the search warrant application.

8.   Attachments A-1, A-2, A-3, A-4, and B are incorporated herein by reference.

9.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  PROBABLE CAUSE

### A.    MEASE'S BACKGROUND IN THE U.S. BANKRTUPCY COURT IN RIVERSIDE

10.  Based on my investigation to date and as more fully set forth below, on August 18, 2004, MEASE was ordered by United States Bankruptcy Judge Thomas B. Donovan to disgorge $50 back to Bankruptcy Petitioner Joyce Moore in Case No. LA 04-19474 TD. Judge Donovan found that MEASE, acting as a Bankruptcy Petition Preparer ("BPP"), charged Petitioner in excess of the court-allowed $150 for BPP services. The form, "Disclosure of Compensation of Bankruptcy Petition Preparer" was included in Case No. LA 04-19474 TD with the name, "RICHARD A. MEASE, SSN XXX-XX-2531." The document was signed as, "Richard A. Mease."

11.  On October 5, 2005, MEASE was ordered by United States Bankruptcy Judge Thomas B. Donovan to disgorge $41 back to Bankruptcy Petitioner Tom Thomas Jr. in Case No. LA 05-26351 TD. Judge Donovan found MEASE charged the petitioner in excess of the court-allowed $150 for reasonable BPP services. MEASE was also fined $2,500 in Case No. LA 05-26351 for failing to file a declaration under penalty of perjury identifying the following: his role as a BPP, his fee as a BPP, and his identifying number that identifies person who prepared the petition. MEASE also violated several other rules, including by failing to sign the aforementioned petition, using the word "legal" in an

5

advertisement, collecting payment from the debtor for court filing fees, and failing to furnish a copy of the petition and schedules to the debtor at the time they were presented for the debtor's signature.

12.   On June 14, 2010, MEASE was fined $2,500 by United States Bankruptcy Judge Meredith A. Jury in Case No. 6:09-bk-30766-MJ for failing to sign and place his identifying number in the bankruptcy petition section(s) entitled "Signature of Non-Attorney Bankruptcy Petition Preparer," failing to provide a certificate attesting MEASE delivered to the debtor the notice required by Section 342(b) of the Bankruptcy Code, as well as failing to provide the required declarations at the end of the debtor's Schedules and at the end of the Statement of Financial Affairs.

13.   On May 24, 2011, United States Bankruptcy Judge Meredith A. Jury enjoined MEASE from performing any further BPP services and fined him $4,000 for his failure to comply with prior court order in Case No. 6:09-bk-30766-MJ.

14.   On November 18, 2011, United States Bankruptcy Judge Meredith A. Jury permanently enjoined MEASE from performing BPP services as ordered in Case No. 6:09-bk-30766-MJ.

15.   On November 20, 2013, MEASE was held in Civil Contempt by United States Bankruptcy Judge Scott C. Clarkson in Case No. 6:11-bk-12484-SC for continuing to act as a BPP in violation of

BPP enjoinment court order issued on November 18, 2011 in Case No. 6:09-bk-30766-MJ.

16.   On July 12, 2016, in Case No. 6:16-bk-11545-MH, United States Bankruptcy Judge Mark Houle ordered MEASE be fined $20,000, pay damages of $2,000 to the debtor, and disgorge $400 for violation of BPP enjoinment court order issued on November 18, 2011, in Case No. 6:09-bk-30766-MJ and concealment of his role as BPP by failing to disclose his name and social security number as the BPP on documents requiring his identification.

17.   On March 2, 2017, in Case No. 2:16-bk-22711-EP, United States Bankruptcy Judge Ernest M. Robles ordered MEASE be fined $13,500, pay damages of $2,000 to the debtor, and disgorge $850 for violation of BPP enjoinment court order issued on November 18, 2011 in Case No. 6:09-bk-30766-MJ and concealment of his role as BPP by failing to include the Official Form 119: Bankruptcy Petition Preparer's Notice, Declaration and Signature ("Form 119"), with the debtor's filed bankruptcy documents.

18.   On April 20, 2017, in Case No. 6:16-bk-19853-SY, United States Bankruptcy Judge Mark Houle ordered MEASE be fined $19,500, pay damages of $2,000 to the debtor, and disgorge $580 for violation of BPP enjoinment court order issued on November 18, 2011 in Case No. 6:09-bk-30766-MJ and concealment of his role as BPP by failing to file a required Official Form 119 with the debtor's filed bankruptcy petition.

    a.   I interviewed Charles Martinez, who was the debtor in Case No. 6:16-bk-19853-SY. Martinez filed his bankruptcy petition on November 4, 2016. Martinez was shown a photo of "RICHARD ALLEN MEASE" from California Department of Motor Vehicles records.  Martinez positively identified MEASE as the person who acted as his BPP in Case No. 6:16-bk-19853-SY. Martinez stated he met MEASE around October 2016. Martinez found MEASE via a referral from a family friend. Martinez realized shortly after filing petition the bankruptcy that he received poor legal advice from MEASE and should have filed for Chapter 13 bankruptcy to protect ownership of his home. Due to MEASE's poor legal advice, Martinez incurred significant legal expenses and had to re-file his bankruptcy petition. MEASE concealed from Martinez his court-ordered enjoinment from acting as a BPP. Martinez paid MEASE $915 for BPP services. Martinez was shown petition for Case No. 6:16-bk-19853-SY and identified his signatures on the petition. Martinez stated MEASE filled out Martinez's entire Chapter 7 bankruptcy petition to include checking "No" on the page 8 question, "Did you pay or agree to pay someone who is not an attorney to help you fill out your bankruptcy forms?"

    b.   I reviewed a cancelled check provided by Linda Martinez that was written by her daughter, Kimberly Plasch. Plasch wrote the check BPP services rendered for Martinez. The check was written on a JP Morgan Account and numbered "4160." The check was dated October 8, 2016, and showed, Pay to order of: "RICHARD MEASE." The check showed payment of $950 and the

"For" line of the check showed, "Martinez." The check was endorsed on the back.

19.    On January 29, 2018, in Case No. 6:17-bk-18584-SY, United States Bankruptcy Judge Scott H. Yun ordered MEASE be fined $19,000, pay damages of $2,000 to debtor, and disgorge $550 for violations of previous court order regarding enjoinment as BPP and concealment of his role as BPP by failing to file the required Official Form 119 with the filed bankruptcy petition.

       a.    I reviewed declaration by Jonathan McClellan, who was the debtor in Case No. 6:17-bk-18584-SY. McClellan provided a declaration to the Bankruptcy Trustee. McClellan stated he called Richard MEASE is August 2016 upon referral from family friend. McClellan hired MEASE as his BPP and paid MEASE $885 in cash which included the $335 filing fee. McClellan stated MEASE completed all of his bankruptcy documents.

       b.    I reviewed the petition in Case No. 6:17-bk-18584-SY and observed on page 8 that "No" was checked on question, "Did you pay or agree to pay someone who is not an attorney to help you fill out your bankruptcy forms?"

20.    On May 15, 2018, debtor Julio Melchor Menendez, filed for Chapter 7 bankruptcy in Riverside, California, in Case 6:18-bk-14088-MW.

       a.    I reviewed an invoice provided to the Bankruptcy Trustee by Menendez. The invoice was dated "5/7/2018," from:

"Ram Legal Services, Richard A. Mease

ramlegalservice@yahoo.com," and to: "Julio Melchor Menendez."

The invoice described the purpose of the invoice to be for:

"Chapter 7 Bankruptcy" and total due to be "$1,550." The invoice

also stated, "MAKE CHECKS PAYABLE TO Richard A. Mease."

      b.   I reviewed photographs of text messages Menendez

provided to the Bankruptcy Trustee. On July 17, 2018, MEASE sent

a text to Menendez that stated, "Please do not give that receipt

to the court, they will use to sue me for way more than you owe

on your bk."

      c.   I reviewed the petition in Case 6:18-bk-14088-MW

and observed on page 8 of the petition the question box "No" was

check in reference to: "Did you pay or agree to pay someone who

is not an attorney to help you fill out your bankruptcy forms?"

whereby MEASE concealed his identity as the BPP.

   21.  On June 19, 2018, in Case No. 6:18-bk-11793-SY, United

States Bankruptcy Judge Scott H. Yun ordered that MEASE be fined

$19,500, pay damages of $2,000 to the debtor, and disgorge $715

for violation of BPP enjoinment court order issued on November

18, 2011, in Case No. 6:09-bk-30766-MJ and concealment of his

role as BPP by failing to file the required Official Form 119

with the filed bankruptcy documents.

      a.   I interviewed William Scheffler, who was the

debtor in Case No. 6:18-bk-11793-SY. Scheffler filed bankruptcy

petition on March 7, 2018. Scheffler was shown a photo of

10

"RICHARD ALLEN MEASE" from California Department of Motor Vehicles records positively identifying MEASE as person who acted as his BPP. Scheffler stated MEASE concealed his court-ordered enjoinment from acting as a BPP. Scheffler paid MEASE $1,050 for BPP services. MEASE refunded approximately $350 to Scheffler for filing fees. Scheffler was shown petition for Case No. 6:18-bk-11793-SY and identified his signatures on the petition. MEASE filled out Scheffler's entire Chapter 7 bankruptcy petition to include checking "No" on the page 8 question, "Did you pay or agree to pay someone who is not an attorney to help you fill out your bankruptcy forms?" whereby MEASE concealed his identity as the BPP.

b.    Scheffler stated he met with MEASE a second time to pick up the completed petition. At this meeting, Scheffler received a completed bankruptcy petition and signed his petition without reading the content, trusting MEASE's judgement as a BPP. Scheffler filed the petition with the Riverside, California bankruptcy court. Scheffler was called into a creditor meeting also known as a "341" meeting. Scheffler told the Trustee that MEASE acted as his BPP. During the meeting, the Bankruptcy Trustee told Scheffler that MEASE was not authorized to act (enjoined) as a BPP or charge more than $200 for BPP services. Shortly after the 341 meeting, Scheffler went back to MEASE's office and confronted him regarding MEASE's actions as a BPP. MEASE responded to Scheffler stating, "We are going to have to

11

turn this around and get this re-filled." Scheffler stated MEASE
was very agitated that Scheffler revealed his identity as his
BPP to the bankruptcy trustee.

22. I reviewed a cancelled check provided by Scheffler
that he wrote and signed drawn on Scheffler's Alaska USA Federal
Credit Union account. The check was dated February 23, 2018 and
written to: "RICHARD A. MEASE." The check showed payment of
$1,050 and the "For" line of the check showed, "BANKRUPTCY." The
check was endorsed on the back.

23. I listened to the recording of a hearing in Case No.
6:09-bk-30766-MJ regarding debtor David C. Snow that occurred on
June 1, 2010. The hearing was presided by United States
Bankruptcy Judge Meredith A. Jury. At the beginning of the
hearing, MEASE announced his appearance. Judge Jury admonished
MEASE for not disclosing his role as a BPP in the petition filed
in Case No. 6:09-bk-30766-MJ. Judge Jury referred to multiple
prior hearings in which MEASE was fined for charging excessive
fees and giving unauthorized legal advice. MEASE denied acting
as a BPP. Judge Jury admonished MEASE for lying and for not
disclosing his role as a BPP in the petition filed by debtor
David C. Snow.

24. I interviewed Bankruptcy Auditor Dimple P. Mehra who
had listened to the recording of a hearing in Case No. 6:11-bk-
12484-SC that occurred on December 18, 2013. Mehra stated she

12

heard MEASE announce his appearance during the hearing. The hearing was presided by United States Bankruptcy Judge Scott C. Clarkson. Mehra stated she heard Judge Clarkson ask MEASE if he is going to prepare any further bankruptcy paperwork and MEASE responded, "No." Mehra also heard Judge Clarkson ask MEASE if he understood that "he is barred" and MEASE responded, "Yes, I understand."

25. I listened to the recording of a hearing in Case No. 6:16:bk-11545-MH that occurred on June 27, 2016 regarding debtor William N. Haddad. The hearing was presided by United States Bankruptcy Judge Mark D. Houle and MEASE announced his appearance at the start of the hearing. Judge Houle made multiple references to the permanent injunction issued by United States Bankruptcy Judge Scott C. Clarkson in 2011. Judge Houle stated that MEASE continued to violate Judge Clarkson's permanent injunction from acting as a BPP. Judge Houle asked MEASE if he had any questions about the ruling and MEASE replied, "no."

## B. RESIDENCY, VEHICLE, BUSINESS AND PERSON OF RICHARD MEASE

26. I reviewed California Department of Motor Vehicles ("DMV") records for RICHARD ALLEN MEASE, license number C0194848, which includes a photograph, dated October 22, 2015. The record lists the address as the SUBJECT PREMISES.

13

27. I reviewed San Bernardino County Sheriff's report Case No. 171810981, dated October 1, 2018, written by arresting officer Alexander Harvey. The report stated MEASE was arrested at the SUBJECT PREMISES on October 1, 2018 for California Penal Code 422(a), Terrorist Threats. Victim R.B.M. stated MEASE threatened to kill him if he did not return his jewelry. Victim R.B.M. stated MEASE kept firearms unsecured in the SUBJECT PREMISES's "Office."

a. I interviewed arresting officer, Deputy Alexander Harvey, San Bernardino Sheriff's Department, who searched SUBJECT PREMISES with MEASE's consent. Deputy Harvey went into SUBJECT PREMISES and specifically searched the "office." Deputy Harvey observed in the "office" stacks of documents and empty laptop cases as well as a computer modem. Deputy Harvey also observed MEASE talking on a smartphone while sitting in the back of Deputy Harvey's squad car.

b. Deputy Harvey searched SUBJECT VEHICLE after speaking with victim R.B.M. and receiving consent from MEASE. Victim R.B.M. had told Deputy Harvey that MEASE had several hidden compartments in SUBJECT VEHICLE that MEASE used to store firearms.

28. I reviewed vehicle registration information for the SUBJECT VEHICLE. According to this registration, the SUBJECT VEHICLE is registered to: Richard A. MEASE, 13581 Fox Point

14

Road, Victorville, CA 92392 (SUBJECT PREMISES), with vehicle
identification number 5GTDN136668103354.

29.   I interviewed William Scheffler, who was the debtor in
Case No. 6:18-bk-11793-SY. Scheffler stated he went to the
SUBJECT BUSINESS in February of 2018 and hired MEASE to be his
BPP. Scheffler observed MEASE using a computer and a smartphone
in the SUBJECT BUSINESS. Scheffler observed stacks of papers on
SUBJECT BUSINESS' office desk. Scheffler completed all his BPP
transactions inside the SUBJECT BUSINESS to include signing the
bankruptcy petition.

30.   I reviewed a surveillance report regarding FBI SA
Steven J. Gale's observations of the SUBJECT BUSNESS. The report
stated that on November 15, 2018, SA Gale observed the SUBJECT
VEHICLE at the SUBJECT BUSINESS at approximately 9:45 a.m. SA
Gale observed a sign above the door with the text, "RAM LEGAL
SERVICES/ACCOUNTING SERVICES." SA Gale observed the door was
made of clear glass with the text, "STRATEGIC BUSINESS
CONSULTING, 760-272-0743, RAM LEGAL SERVICES 760-617-2075.

31.   I was told by FBI SA Johannes Fernandez, Team Leader,
Surveillance Operation Group, that MEASE was observed at
approximately 9:00 am, on November 30, 2018, leaving the SUBJECT
PREMISES and get in the SUBJECT VEHICLE then drive directly to
SUBJECT BUSINESS. SUBJECT VEHICLE remained at the SUBJECT

BUSINESS until approximately 11:00 am on November 30, 2018, when surveillance was discontinued.

32. I was told by FBI SA Johannes Fernandez, Team Leader, Surveillance Operation Group, that MEASE was observed at approximately 9:50 am, on December 7, 2018, leaving the SUBJECT PREMISES and get in the SUBJECT VEHICLE then drive directly to the SUBJECT BUSINESS. SUBJECT VEHICLE remained at the SUBJECT BUSINESS until departing in SUBJECT VEHICLE at approximately 11:00 am. At approximately 11:18 am, MEASE was observed exiting SUBJECT VEHICLE carrying a large envelope and other paperwork then enter the High Desert Government Center ("HDGC"), 15900 Smoke Tree, Hesperia, California. MEASE was observed at 12:21 pm departing the HDGC in the SUBJECT VEHICLE and arrive at the SUBJECT BUSINESS at 12:45 pm, on December 7, 2018, when surveillance was discontinued.

33. I reviewed FBI SA Steven J. Gale's interview report regarding his December 7, 2018 interview of J.E. J.E. reported that she operates a tax preparation business called "Strategic Business Consulting," located at 14196 Amargosa Road, Suites I and J, Victorville, California. J.E. stated MEASE operates "Ram Legal Services" from the same location. J.E. described Suites I and J as having south opening doors that lead to a shared reception area with a desk, couches and chairs. There is a bathroom located on the west side of the reception area. J.E. stated that to the north of the reception area is a hallway that

leads to the back door of the location and on the east side of the hallway is a door that leads to MEASE's one room office. J.E. is aware that MEASE operates a BPP business as she had referred Martinez to MEASE for BPP assistance. J.E. had referred several of her clients to MEASE for BPP assistance. J.E. stopped referrals after hearing from Martinez that MEASE had improperly handled the Martinez bankruptcy.

a.   J.E. observed the interior of MEASE's office on December 7, 2018. J.E. was escorting maintenance workers throughout the suite to survey for water damage. MEASE consented to leave his door open to allow J.E. and the workers into his office to determine extent of the water damage. During this time, J.E. took a photograph of MEASE's office interior from the hallway. I reviewed the photograph, which showed a desktop computer, file folders and several documents as well as a file cabinet.

b.   J.E. observed MEASE on December 7, 2018 driving a white H3 Hummer from the SUBJECT BUSINESS. J.E. stated MEASE frequently leaves the white H3 Hummer at the SUBJECT BUSINESS. J.E. observed MEASE bringing documents into the SUBJECT VEHICLE approximately one week ago.

c.   J.E. observed MEASE on December 7, 2018 speaking on a smartphone. J.E. stated MEASE does not have a land line in his office.

34.   Computers. Based on my knowledge, training and

experience in bankruptcy investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know computers and computer technology are used to automate and complete business forms to include bankruptcy petitions and documents. The computer's ability to store data in digital form makes the computer itself an ideal repository for business records.

35. Documents. Based on my knowledge, training and experience in bankruptcy investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know documents are used to record financial transactions and serve as a repository for information that will be needed for future transactions and tax reporting. As such, persons routinely store multiple years of documents in areas that are readily accessible and helpful to ongoing business concerns.

C.   CONTEMPT OF COURT

36. Based on my experience, investigative research, and consulting with the Bankruptcy Trustee, I know that as of the time the petitions for Scheffler, Martinez and McClellan were filled, a BPP is only allowed to charge $200 to prepare bankruptcy documents and is not allowed to provide legal advice.

37. I reviewed records provided by Bankruptcy Trustee that showed MEASE was held in civil contempt on at least eight different occasions from 2011 to 2018 for charging in excess of court allowed charges for BPP services, concealing his role as

18

BPP, and ignoring court-ordered enjoinment from acting as a BPP.
MEASE has been ordered by several bankruptcy judges to disgorge
a total of $9,794, pay $20,396 in damages, fined $139,500, and
been assessed $252 in attorney fees. MEASE owes $169,932 to the
federal bankruptcy court through the aforementioned judgements.

## IV.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

38.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are

---

[1] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for

devices or data that cannot currently be decrypted.

39. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

   b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MEASE's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MEASE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  41. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## XII.CONCLUSION

42. For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found at the SUBJECT PREMISES, SUBJECT VEHICLE, SUBJECT BUSINESS, and MEASE.

_____

Colin L. Schmitt, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me

this _____ day of December, 2018.

_____
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A-1

## DESCRIPTION OF THE SUBJECT PREMISES TO BE SEARCHED

The location to be searched is located at 13581 Fox Point Road, Victorville, California 92392 ("SUBJECT PREMISES").

The SUBJECT PREMISES is a tan, two-story track house, third structure from the street corner of Fox Point Road and Clear Valley Road. The SUBJECT PREMISES is located on the east side of Fox Point Road. The numerals "13581" are stenciled on the front of the house above a window located in between the two-car garage and the front door of the house. The house has a brown, tile roof, one garage door and white front door.

**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 401 (CONTEMPT), 402 (CONTEMPT CONSTITUTING CRIMES), and 152(3) (BANKRUPTCY FRAUD - FALSE DECLARATIONS)(the "Subject Offenses"), namely:

   a.    Documents from accounts receivable and payroll, including expense reports, receipts for expenses, petty cash logs, petty cash receipts, credit card bills, invoices, and other documents reflecting expenses or accounting records for RICHARD ALLEN MEASE ("MEASE") and/or RAM Legal Service, dated after January 1, 2014.

   b.    Documents reflecting the source of any referral for Bankruptcy Petitioner clients to MEASE and/or RAM Legal Service, dated after January 1, 2014.

   c.    Documents reflecting the use of proceeds from the Subject Offenses, including bank records, accounting records, and other financial records, dated after January 1, 2014.

   d.    Personnel and payroll files and records, employee lists, employee manuals, documents reflecting names, addresses, duration of employment, pay schedules, W-2's, 1099s, duties, and reasons for separation or termination from employment of

vi

employees, independent contractors, or other individuals paid for services by MEASE and/or RAM Legal Service, dated after January 1, 2014.

e.   Records containing, concerning, or constituting bank statements, credit card statements, checks, check registers, applications, and financial documents of MEASE and/or RAM Legal Service, dated after January 1, 2014.

f.   Records containing telephone directories, phone logs, appointment books, calendars, diaries, notes, address books, and memoranda concerning MEASE and/or RAM Legal Service, dated after January 1, 2014.

g.   Accounting records, such as balance sheets, income or profit/loss statements and related work papers, charges of accounts, trial balances, general or subsidiary journals and ledgers, inventory logs, expense accounts, loan documents, notes, and financial agreements, dated after January 1, 2014.

h.   Documents reflecting ownership and/or control of the SUBJECT PREMISES and SUBJECT BUSINESS, limited to 15 items per location.

i.   Records, documents, or materials concerning bankruptcy, including Official Form(s) 101, 103B, 107, 108, and 119 as well as client work papers/files supporting bankruptcy petition filings, dated after January 1, 2014.

vii

j.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

k.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

x

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques [, including to search for known images of child pornography.]

       c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.     If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.     The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.     After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.     In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.     Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.     Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6. During the execution of this search warrant, law enforcement is permitted to: (1) depress MEASE's thumb- and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MEASE's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than

objectively reasonable force in light of the facts and circumstances confronting them.

The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.